Karl Schmitt and Elizabeth Schmitt v. Commissioner.
Schmitt v. Commissioner
Docket No. 2712-65.
United States Tax Court
T.C. Memo 1967-159; 1967 Tax Ct. Memo LEXIS 102; 26 T.C.M. (CCH) 742; T.C.M. (RIA) 67159; August 2, 1967
*102 Sheldon Schwartz, 551 5th Ave., New York, N. Y., for the petitioners. Joel Kamens and Richard J. Mandell, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Repondent determined deficiencies in petitioners' income tax and additions to tax as follows: Additions to Tax
- § 6653(a) of
Year
Deficiency
the 1954 I.R.C.
1959
$1,745.16
$ 87.26
1960
2,524.29
126.22
1961
5,961.26
298.06
1962
1,706.04
85.30 Respondent has conceded that the statute of limitations for the year 1959 has expired and is therefore a bar to the assessment of any income tax liabilities against petitioners for said year. The issues are (1) whether petitioners had unreported income in each of the years 1960, 1961 and 1962; (2) whether petitioners' partnership income in each of the years 1960, 1961 and 1962 should be increased by reason of certain adjustments; and (3) whether petitioners are liable for additions to tax under section 6653(a) of the 1954 I.R.C.[1] for each of the years 1960, 1961 and 1962. *103 Findings of Fact Some of the facts were stipulated and they are so found. Karl Schmitt and Elizabeth Schmitt, husband and wife, are residents of Merrick, New York. They filed joint Federal income tax returns for the years 1960, 1961 and 1962 with the district director of internal revenue, Brooklyn, New York, and they filed partnership returns of income (for the partnership of Karl and Elizabeth Schmitt in the operation of a delicatessen store) on a cash basis of accounting for each of the years 1960, 1961 and 1962 with the district director of internal revenue, Brooklyn, New York. Karl Schmitt, hereinafter called the petitioner, came to the United States from Germany in 1930. In 1944, petitioner married Elizabeth, who had come to the United States from Germany in 1938. Their two sons, Richard and Daniel, were born in 1945 and 1948, respectively. Both sons resided with and were supported by petitioner and his wife during the taxable years here involved. Petitioner and Elizabeth had no accumulated funds on hand as of January 1, 1932. Except for his period of service in the United States Army from March 1942 to January 1946, petitioner was employed by various employers as a *104 butcher or as a meatcutter from 1930 until the end of 1955. Petitioner lived with his brother from 1930 to March 1942 when he entered the United States Army. Elizabeth worked in various delicatessen stores for room and board plus a small monthly salary from 1938 until about the end of 1941. During the years 1942 until 1945 she worked for a meat packing company and a sugar refining company. Elizabeth lived with her sister from about the end of 1941 until she married Karl in April 1944. Subsequent to Karl's discharge from the United States Army in January 1946 he and his family lived in various apartments until 1950 when they purchased a home for approximately $12,500 in Cambria Heights, Queens, New York. In 1956, petitioner sold the home in Cambria Heights, receiving $1,500 when the contract of sale was signed and $4,237.40 on May 22, 1956, in cash and by check. Petitioner and his wife purchased a delicatessen store on January 20, 1956 for $12,722.45, which amount was paid as follows: Paid on signing of contract
$ 1,200.00
Cashier's check
2,800.00
Loan from Walter Pfaff
2,000.00
Cash
222.45
Purchase money mortgage
6,500.00
$12,722.45 The loan of $2,000 *105 from Walter Pfaff was repaid in May 1956. The purchase money mortgage, which was payable at the rate of at least $100 per month, was paid off prior to December 31, 1962. Petitioner and his wife operated the store as equal partners during the years before us. Petitioner and his wife purchased their present home in Merrick, New York, in January 1957 for $16,588.30, which amount was paid as follows: Paid on signing of contract
$ 1,500.00
Paid on closing
3,588.30
Mortgage
11,500.00
$16,588.30 On March 2, 1961, the outstanding balance on the mortgage in the amount of $9,939.85 was paid, together with interest of $2.33, and a prepayment penalty of $210.06. Petitioner had a checking account from 1953 to 1956 with the Springfield Gardens National Bank of New York. From 1956 through 1962 petitioner had a checking account with the Meadow Brook National Bank. On May 1, 1939, Elizabeth opened a savings account with the Ridgewood Savings Bank, and from July 18, 1945 this account has been in the names of petitioner and his wife. On January 18, 1956, petitioner and his wife opened a savings account with the Meadow Brook National Bank. From May 31, 1960 through December 31, 1960, petitioner *106 and his wife made 27 deposits in the Meadow Brook National Bank savings account totalling $2,700. These deposits, generally made weekly, were each in the amount of $100. During 1961, petitioner and his wife made 49 deposits in this savings account totalling $5,200. Most of these deposits, which were regularly made throughout the year, were in amounts of $100 each. In August 1961, a deposit of $1,000 was made in the savings account maintained by petitioner and his wife at the Ridgewood Savings Bank. During 1962, petitioner and his wife made at least 43 deposits in their Meadow Brook National Bank savings account totalling $5,300. These deposits, which were regularly made, included 10 in the amount of $200 each and 33 in the amount of $100 each. During the years 1959, 1960 and 1961, petitioner and his wife made cash purchases of mutual funds in the total respective amounts of $5,000, $5,000 and $3,000. The 1961 purchases in the amount of $3,000 include a $2,000 purchase of mutual funds made with funds withdrawn by petitioner and his wife from their savings account at the Meadow Brook National Bank on September 27, 1961. Respondent did not include this $2,000 purchase as a basis for *107 unreported income in 1961 inasmuch as the funds were already included on the basis of deposits made to this savings account in 1961. Petitioner and his wife reported the following income on their joint returns for 1960, 1961 and 1962: 1960
1961
1962
Income from delicatessen business
$7,451.16
$7,574.39
$7,393.45
Dividends
146.36
214.37
252.92
Gains realized on mutual funds
252.58
41.54
Interest
309.49
$7,597.52
$8,041.34
$7,997.40
Respondent determined that petitioner and his wife had additional partnership income from the operation of their store in 1960, 1961 and 1962 in the respective amounts of $2,065, $1,986.20 and $1,580. These increases in the partnership income of petitioner and his wife resulted from (1) the disallowance of a portion of certain deductions claimed on the partnership returns on the ground that such disallowed items represented personal expenditures of petitioner and his wife; and (2) the decrease of the cost of partnership purchases used to compute the cost of goods sold on the partnership returns on the ground that the food taken from the delicatessen store for the personal use of petitioner and his family *108 was in excess of the $600 shown on the partnership returns for each of the years 1960 and 1961 and the $800 on the 1962 partnership return as the cost of items withdrawn for personal use. The following schedule shows the adjustments made by the respondent: 1960
1961
1962
Partnership Purchases - personal
use: Respondent
$2,080
$2,080
$2,080
Petitioner
600
600
800
$1,480
$1,480
$1,280
Heat, light and power de-
ducted on partnership return
$1,100.13
$1,079.13
$1,101.85
As adjusted
800.13
779.13
801.85
300
300
300
Insurance deducted on part-
nership return
$ 400.48
$ 473.76
As adjusted
115.48
267.56
285
206.20
Total increase in partner-
ship income
$2,065
$1,986.20
$1,580
Respondent also determined that petitioner and his wife, in addition to the increases in their income arising from the adjustments to the partnership income, had unreported income in the years 1960, 1961, and 1962 in the respective amounts of $7,700, $17,200 and $5,200. Respondent's explanation for his determinations of unreported income in 1960 and 1962 in the respective amounts of $7,700 *109 and $5,200 was that they were "[based] on an analysis of bank deposits and a mutual fund purchase." Respondent's explanation for his determination of unreported income of $17,200 in 1961 was as follows: Cash paid to satisfy home mortgage
$10,000
Deposits to savings accounts: Meadow Brook National Bank
5,200
Ridgewood Savings Bank
1,000
Purchase of mutual fund
1,000
$17,200
Petitioner failed to report interest income received from savings accounts during the years 1960, 1961 and 1962 in the respective amounts of $28.51, $166.76 and $47.29. Opinion Respondent, in determining that petitioner had unreported income during the years 1960, 1961 and 1962 in the respective amounts of $7,700, $17,200 and $5,200, used the cash expenditures method and added bank deposits which he determined had not been reported as income. In Hoffman v. Commissioner, 298 F. 2d 784 (C.A. 3, 1962), affirming in part a Memorandum Opinion of this Court, the Court of Appeals stated that "[the] use of the 'cash expenditure method,' an outgrowth of the more well known net worth method of reconstructing income, has been applied in civil as well as criminal cases and has *110 been frequently sustained." See also United States v. Caserta, 199 F. 2d 905 (C.A. 3, 1952). [2]
We are convinced from all the evidence that respondent was justified here in employing this method to reconstruct petitioner's income. Petitioner's records of the delicatessen business consisted of a cash disbursements and a cash receipts book which were kept by a public accountant who testified that the entries in these books were made from materials supplied wholly by petitioner. These books, which were kept on a monthly basis and sometimes on a quarterly basis, were used by the accountant to prepare the income tax returns for petitioner *111 and for the partnership during the years here involved. Petitioner also kept a daily book (a steno pad) in which he listed his business receipts from the delicatessen store on a daily basis. In any event, respondent is not precluded from using the cash expenditures method simply because these books existed, since, even though such books may on their face appear to be accurate, the cash expenditure method itself is a test of their accuracy. Hoffman v. Commissioner, supra. Petitioner contends that his mutual fund purchases of $5,000 and $1,000 in 1960 and 1961, the satisfaction of the mortgage on his home in 1961 through payment of the amount of $10,000, and the savings account deposits of $2,700, $6,200 and $5,200 in 1960, 1961 and 1962, respectively, or total outlays of $30,100 over the three-year period, were all made with money from two sources: (1) current reported earnings from petitioner's delicatessen business during the years 1956 through 1962 after payment for all living expenses; and (2) a cash hoard of $12,000 accumulated by petitioner over a period of about 26 years (from 1930 through 1956). Petitioner states that his total reported earnings over the period *112 1956 through 1962 were $51,715.88; that the total living expenses for himself and his family (wife and two children) during this seven-year period amounted to $27,374 and that when these living expenses, together with the amount of $2,900 used for the purchase of an automobile in 1958, were deducted from his total 1956-1962 earnings of $51,715.88 he had net savings of $21,441.88 [3] for the 1956-1962 period; and that these net savings of $21,441.88, when added to the cash hoard of $12,000 accumulated prior to 1956, left petitioner with total cash of $33,441.88 which was available for the large expenditures made by him during the years here involved. Respondent contends that cash expenditures and bank deposits totaling $30,100 represent unreported income from petitioner's business during the years 1960, 1961 and 1962. It is respondent's position (1) that the record fails to support a cash hoard of $12,000 over the 1932-1956 period and (2) that all of petitioner's reported earnings of $51,715.88 were used for the normal living expenses of petitioner's family of four over the 1956-1962 period, so that no net savings existed which could account for any of the large expenditures made during *113 the years 1960 through 1962. Petitioner has the burden of showing error in the respondent's determination. At the outset, we find petitioner's cash hoard story unconvincing. He testified that he managed to accumulate a cash fund of $6,000 from 1930 to 1942 although during some of these years he earned less than $1,000 a year and did not earn more than $1,500 a year until 1939, 1940 and 1941 when his annual wages were in the $1,500-$2,000 a year range. [4] Even though petitioner lived with his brother Bernard up to 1942 and paid $8 a week for room and board, we find it difficult to believe that petitioner managed to accumulate a cash hoard of $6,000 by 1942 in a little green box. He might have had some accumulation of cash but we cannot believe there was any accumulation of cash in existence in 1960. Petitioner further testified that from 1946 to 1955, when he worked for a series of employers at wages ranging from about $2,800 a year to $4,600 a year, he managed to accumulate another $6,000 most of which, according to his wife's testimony, *114 was kept in a knitting bag and in other places. Yet during this period he bought a home (1950), made mortgage payments which (at least in 1954 and 1955) were over $90 a month, made expenditures for furniture, and provided for the support of his wife and two sons, Richard and Daniel, born in 1945 and 1948, respectively. Petitioner also contends that his wife Elizabeth, who came to the United States in 1938, was able to accumulate $4,000 (most of it purportedly kept in a bureau drawer) from 1938 to 1945 and that this cash accumulation was used to pay part of the $6,000 down payment for the delicatessen store purchased by petitioner and his wife in 1956. In other words, petitioner would have us believe that this cash fund of $4,000 remained intact and inviolate for more than 10 years after Elizabeth stopped working in 1945. From 1938 *115 to 1941, Elizabeth worked in various delicatessen stores receiving room and board and about $35 a month in wages. From 1941 to 1945 she worked for several employers and received wages ranging from $27 a week to $35 a week. We regard it as extremely unlikely that Elizabeth managed, with these earnings, to accumulate a cash fund of $4,000 by 1945 and then to preserve such fund intact over a period of more than 10 years. The testimony of petitioner's brother, Bernard, was not very helpful as corroborating evidence of the cash hoard story. Bernard merely testified that he saw petitioner's cash box when petitioner lived in Bernard's apartment and saw some money in the box. Bernard also testified that he last saw this box in 1941 or 1942. It also appears that no one, neither petitioner nor Bernard, counted the money in 1942 when petitioner purportedly had accumulated about $6,000 just prior to entering the United States Army. In fact, the record is extremely vague about when, if at all, this mounting cash hoard was ever counted by petitioner or anyone else. Finally, we are not too impressed with the explanations offered by petitioner and his wife that their cash accumulations at home *116 were prompted by a reluctance to patronize banks or by the inconvenience of going to banks, since it appears from the record that Elizabeth did, in fact, have a savings account from May 1939 which was quite active during the years prior to 1945, and it also appears that from 1945 through the period here involved petitioner and his wife had a joint savings account. In addition, petitioner had a checking account from 1953 through the period here involved. We are convinced that, even if petitioner and his wife did manage to accumulate some cash prior to 1956 in addition to the balances in their savings account, [5] such cash accumulations probably would have been depleted when they purchased a delicatessen store on January 20, 1956 for $12,722.45, making a cash payment of about $6,200. Petitioners borrowed $2,000 from one Walter Pfaff in order to make the above cash payment on the store, and this loan would also seem to negate the existence of an available cash hoard of $12,000 as of the end of 1955. Nor do we believe that any of the cash expenditures *117 made by petitioner during the years 1960, 1961 and 1962 came from savings out of reported income during the years 1956 through 1959. Petitioner reported income in the total amount of $28,206.97 during the 1956-1959 period. However, it is established by the record, mostly through the evidence of checks issued by petitioner, that petitioner had personal expenditures for such items as insurance, taxes, utilities, an automobile, mortgage payments on the home, mutual funds, driver's licenses and so on in the total approximate amount of at least $21,000, leaving slightly more than $7,000 over a 4-year period (about $35 a week) to provide the additional needs of a family of four for food, clothing, maintenance of a home newly purchased in 1957, incidental expenses, and, in addition, to make the periodic payments on the purchase money mortgage incurred when the delicatessen store was purchased in January 1956. We do not believe that petitioner, under these circumstances, would have been able to accumulate any cash fund out of his reported earnings during the 1956-1959 period which could explain his large cash expenditures in the subsequent years. During the years 1960, 1961 and 1962 petitioner *118 reported income in the approximate amounts of $7,600, $8,000 and $8,000 respectively. Respondent argues that petitioner used his entire reported income for personal living expenses during these years and that the funds available for mutual funds, deposits and the mortgage payment during these years could not possibly have come out of current reported earnings. In order to decide whether petitioner did in fact spend his entire reported income for living expenses we cannot ignore the adjustments made by respondent during this same period in the partnership income from the delicatessen store for such items as food consumed by petitioner's family, utilities and insurance expenditures (discussed below). However, to the extent that petitioner used partnership funds to defray personal living expenses, it would lessen his living expenditures actually made and, correspondingly, would increase the funds available from the current reported earnings for mutual fund purchases, deposits, and the mortgage payment in 1961. In the years 1960, 1961 and 1962 petitioner made personal expenditures, as shown by his checks and other evidence, of about $4,835, $3,900 and $3,370, respectively, for such items *119 as insurance, driver's licenses, education for children, taxes, medical expenses, mortgage payments on the home, and utilities, leaving about $2,765, $4,100 and $4,630 in 1960, 1961 and 1962, respectively, to cover the remaining family living expenses and any other personal expenditures during these years. It has been stipulated that the purchase money mortgage of $6,500 on the store purchased in January 1956 was paid off prior to December 31, 1962, so presumably petitioner was making periodic payments during at least some portion of the 1960-1962 period. We also note that, according to respondent's adjustments to partnership income, the petitioner met some of his living expenses for food, utilities and insurance in the years 1960, 1961 and 1962 in the respective amounts of $2,065, $1,986.20 and $1,580 through the use of partnership funds. Upon examination of all the evidence and testimony bearing upon the living expenses incurred by petitioner and his family during the 1960-1962 period and taking into consideration the adjustments to partnership income, we feel that petitioner was able to save some portion of his 1960-1962 reported earnings and that such savings were a source of *120 at least some of the funds used for savings account deposits, mutual fund purchases and the large cash expenditure in 1961. Using our best judgment, we find that petitioner had net cash savings of $2,000, $3,000 and $3,500 available in the years 1960, 1961 and 1962 which could serve (to that extent) as a source of the mutual fund expenditures, the enumerated bank deposits and the mortgage payment in 1961 which respondent used as the basis for his determinations of unreported income during these years. [6]
Respondent also increased the partnership income of petitioner and his wife from the delicatessen store in the amounts of $2,065, $1,986.20 and $1,580 for the years 1960, 1961 and 1962 respectively. Respondent determined that the cost of items withdrawn from the store by petitioner and his wife for personal use in each of the years 1960, 1961 and 1962 was $2,080 rather than the amounts of $600 and $800 indicated on the partnership returns of income. [7] Respondent also disallowed as personal expenses *121 a portion of the deductions claimed by the partnership for heat, oil and power in the amount of $300 in each of the years 1960, 1961 and 1962 and, in addition, disallowed as personal expenses a portion of the insurance expense deducted by the partnership in the amounts of $285 and $206.20 in the years 1960 and 1961, respectively. We believe that petitioner has failed to meet his burden of showing that respondent's determinations were in error. [8] In fact, the evidence tends to support the adjustments made by respondent. Petitioner's wife testified that most of the food for her family of four came from the store and that she did not spend over $100 a year for food from outside the store. As for the adjustments made for insurance and for utilities, it appears from the record that personal expenditures and business expenditures for these items were mixed together and we are satisfied that an adjustment was necessary on the partnership return to reflect the personal expenditures. *122 Moreover, an analysis of the checks issued by petitioner over the years 1960, 1961 and 1962 clearly indicates that the portion of the total expenditures for utilities allocated to the partnership (rather than to personal use) was excessively high in each of the years before us. We sustain respondent in the adjustments made by him in the food item and in the utilities item. As to the insurance deduction adjustment, the evidence shows that the partnership was entitled to a deduction of $257.58 for 1960 rather than the amount of $115.48 which was allowed by respondent. Petitioner makes no argument regarding *123 the insurance adjustment for 1961 and we are satisfied that it is correct. Respondent determined that petitioner is liable for additions to tax under section 6653(a) for the years 1960, 1961 and 1962. This section provides that "[if] any part of any underpayment * * * is due to negligence or intentional disregard of rules and regulations * * * there shall be added to the tax an amount equal to 5 percent of the underpayment." Petitioner has the burden of proof on this issue. David Courtney, 28 T.C. 658 (1957). We cannot find on this record that petitioner has met his burden of showing that the underpayment for each of the years 1960, 1961 and 1962 was not due to negligence. Petitioner did not choose to develop separately any argument on brief concerning this issue. We sustain respondent on this issue. Decision will be entered under Rule 50. Footnotes
1. All section references will be to the 1954 Internal Revenue Code↩, as amended, unless otherwise noted.
2. In the Caserta case the Court explained the cash expenditures test as follows: * * *
It starts with an appraisal of the taxpayer's net worth situation at the beginning of a period. He may have much or he may have nothing. If, during that period, his expenditures have exceeded the amount he has returned as income and his net worth at the end of the period is the same as it was at the beginning (or any difference accounted for), then it may be concluded that his income tax return shows less income than he has in fact received.↩
3. We have corrected petitioner's erroneous computation on brief which shows net savings for the 1956-1962 period in the amount of $24,441.88.↩
4. These annual earnings are based upon petitioner's testimony. However, respondent introduced in evidence a record of yearly earnings by petitioner beginning in 1937 credited to petitioner under the Social Security program and from this record it would seem that petitioner in his testimony exaggerated his yearly earnings for the years 1937 to 1942.↩
5. As of December 31, 1955, the savings account of petitioner and his wife at the Ridgewood Savings Bank showed a balance of $1,218.91.↩
6. Petitioner states in his brief that he and his wife had no remaining available cash at the end of the period here involved. We find nothing in the record to dispute this statement.↩
7. This adjustment, by reducing the cost of purchases, served to decrease the partnership's cost of goods sold and correspondingly increase the partnership income for each of the three years invloved.↩
8. In the notice of deficiency, respondent determined that petitioner had additional income in 1960, 1961 and 1962 in the respective total amounts of $2,065, $1,986.20 and $1,580 because of adjustments to partnership income. There is no merit in petitioner's contention that the notice of deficiency was somehow defective because it did not contain a detailed explanation of the adjustments to partnership income. Moreover, petitioner's attorney orally stipulated at the trial that a copy of the agent's report "was furnished to my clients * * * prior to the statutory ninety-day notice."↩